STEVEN A. GIBSON, ESQ.
Nevada Bar No. 6656
sgibson@righthaven.com
J. CHARLES COONS, ESQ.
Nevada Bar No. 10553
ccoons@righthaven.com
Righthaven LLC
9960 West Cheyenne Avenue, Suite 210
Las Vegas, Nevada 89129-7701
(702) 527-5900
Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| RIGHTHAVEN LLC, a Nevada limited-liability company, | Case No.: 2:10-cv-01036-LRH-PAL |
| Plaintiff, | **PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS** |
| v. | |
| REALTY ONE GROUP, INC., a Nevada corporation; DAVID TINA, an individual; and MICHAEL J. NELSON, an individual, | |
| Defendants. | |

Righthaven LLC ("Righthaven") hereby opposes Defendant Michael J. Nelson's ("Mr. Nelson") Motion to Dismiss.  Righthaven bases this motion on the accompanying declaration of J. Charles Coons ("Coons Decl."), the pleadings and papers on file in this action, on any oral argument this Court may allow, and on any other matter of which this Court takes notice.

1

## MEMORANDUM OF POINTS AND AUTHORITIES

I.     __INTRODUCTION__

    A.   ***Fair Use***

        Mr. Nelson's infringement of a Righthaven-owned literary work falls woefully short of the statutory threshold for fair use. *See* 17 U.S.C. § 107. Mr. Nelson's infringement contains no transformative value whatsoever; the infringing work essentially supersedes the copyrighted work's original purpose. Moreover, as demonstrated by the evidence, Mr. Nelson's unauthorized use of this Righthaven-owned copyrighted work was entirely motivated by commercial gain. Additionally, despite the fact-based nature of the infringed work, the authorship of the work nevertheless required creative expression and elements of originality. Mr. Nelson's infringement of this work represented a verbatim reproduction of the heart of the work's literary content, thus Mr. Nelson's infringement was substantial and significant in relation to the work as a whole. Finally, because Mr. Nelson's infringement of the copyrighted work essentially served as a substitute for the original, Mr. Nelson cannot reasonably argue that his infringing conduct did not materially impair the value of, and potential market for, the literary work. As each of the prongs in the Court's fair use analysis either fall in Righthaven's favor or are neutral, Mr. Nelson's fair use defense must fail.

    B.   ***Unclean Hands***

        The reckless assertion of unclean hands as a defense to Mr. Nelson's blatant copyright infringement cannot be entertained by the Court. Righthaven's pursuit of the instant copyright infringement claim is well-founded both in fact and in law, and is entirely devoid of illegality or transgression on behalf of Righthaven. Consequently, Mr. Nelson's assertion of the defense of unclean hands is both irresponsible and entirely unmeritorious. Mr. Nelson bases his argument on a variety of unrelated facts, none of which have any bearing on the legal standard for unclean hands, or any bearing on this lawsuit in general. Similarly, Mr. Nelson fails to cite any legal authority to support these irrelevant contentions. Mr. Nelson does not come remotely close to

satisfying the standard for unclean hands, and has instead raised this defense merely as a diversionary tactic to mask his obvious culpability for copyright infringement.  Ultimately, Mr. Nelson cannot escape the fact that this lawsuit arises not from any wrongdoing or illegality attributable to Righthaven, but from Mr. Nelson's utter disregard for Righthaven's copyright ownership.

## II.    FACTS

Righthaven is the owner of the copyright in the literary work entitled: "Program may level housing sale odds" (the "Work"). (Compl. Ex. 2.)  The Work was originally published on April 30, 2010. (Compl. ¶ 37.)  Righthaven acquired ownership of the Work on or about May 25, 2010, whereupon Righthaven entered into a copyright assignment with Stephens Media LLC (the "Righthaven Assignment"; a true and correct copy of which is attached hereto as Exhibit 1).  The Righthaven Assignment transferred to Righthaven exclusive ownership of the copyright in and to the Work in its entirety, and also assigned Righthaven with the right to seek redress for all accrued causes of action. (Ex. 1.)  On June 8, 2010, the United States Copyright Office granted Righthaven the registration to the Work, copyright registration number TX0007151822. (Compl. ¶ 38.) (Compl. Ex. 6.)

Mr. Nelson is the author of the blog forum found at the Internet domain: <michaeljnelson.featuredblog.com> (the "Website"). (Compl. ¶ 13.)  On or about May 10, 2010, Mr. Nelson publicly displayed an unauthorized reproduction of the Work (the "Infringement") on the Website. (Compl. ¶¶ 17, 19.) (Compl. Ex. 3.)  The Infringement is comprised of a verbatim copy of six of the Work's seventeen paragraphs. (*See* Compl. Ex. 2-3.)  Additionally, whereas the Work attributes authorship to: "HUBBLE SMITH LAS VEGAS REVIEW-JOURNAL," the Infringement instead states: "Posted by Michael Nelson under For Buyers, General Information." (Compl. Ex. 2-3.)  The Infringement does not contain any additional commentary or criticism – posted either by Mr. Nelson or by third parties – to distinguish the Work from the Infringement. (*See* Compl. Ex. 2-3.)  Mr. Nelson did not seek permission, nor

was Mr. Nelson granted permission, in any manner, to reproduce, display, or otherwise exploit the Work. (Compl. ¶¶ 41-42.)

In addition to the Infringement, Mr. Nelson also publicly displayed, on the Website, unauthorized reproductions of the Righthaven-owned literary works entitled: "Las Vegas property values at 2000 levels" (the "Property Values Article") and "More can qualify for homeownership in Las Vegas" (the "Homeownership Article"). (Compl. ¶¶ 24-29.) (Compl. Ex. 4-5.)  Mr. Nelson did not seek permission, nor was Mr. Nelson granted permission, in any manner, to reproduce, display, or otherwise exploit the Property Values Article or the Homeownership Article. (Compl. ¶¶ 24, 27.)

## III.   ARGUMENT

### A.   *Mr. Nelson's Infringement Does Not Constitute Fair Use*

Mr. Nelson's act of blatant copyright infringement fails to satisfy the statutory threshold for fair use, thereby warranting a denial of the Motion to Dismiss.  When a copyright defendant asserts the affirmative defense of fair use, the district court must consider the following factors: "(1) the purpose and character of the use; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the work as a whole; and (4) the effect of the use upon the potential market for the work or the value of the work." *A&M Records, Inc. v. Napster, Inc.,* 239 F.3d 1004 (9th Cir. 2001) (internal quotation marks omitted); *see also* 17 U.S.C. § 107.  As detailed below, each of these four factors either favors Righthaven or are, at worst, neutral.  Accordingly, Mr. Nelson cannot escape liability for his infringing conduct on a theory of fair use.

### 1.   *The Infringement is Not Transformative and is Commercial in Nature*

Mr. Nelson's Infringement contains no transformative value whatsoever and effectively supersedes the Work's original purpose.  Additionally, Mr. Nelson's public display of the Infringement on the Website was intended to generate support – both financial and non-financial – for his real estate operation, and thus constituted a commercial use.

The first prong in the fair use analysis falls heavily in Righthaven's favor.  This first factor calls for consideration of "the purposes and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1).  In this regard, the court must determine whether the alleged infringement "merely replaces the object of the original creation or instead adds a further purpose or different character." *Napster, Inc.,* 239 F.3d at 1015.  In other words, this analysis hinges on "whether and to what extent the new work is transformative." *Campbell v. Acuff-Rose Music, Inc.,* 510 U.S. 569, 579 (1994). This inquiry has a wide-ranging impact on the fair use analysis: "the more transformative the new work, the less will be the significance of the other factors, like commercialism, that may weigh against a finding of fair use." *Id.*  The inverse of this principle must also be true: the less transformative the infringing work, the less will be the significance of the other factors that may support a copyright defendant's assertion of fair use.

In the instant matter, Mr. Nelson's verbatim copying of a substantial portion of the Work offers no transformative value.  Mr. Nelson does not insert any additional commentary, criticism, or modification to the Infringement or to the content of the Infringement such that it can reasonably be distinguished from the Work.[1]  In fact, a cursory review of the Work and Infringement reveals that Mr. Nelson merely copied-and-pasted the first six paragraphs of the Work and posted this copied material as a blog entry on his Website. (*See* Compl. Ex. 2-3.)  This type of thoughtless infringing conduct falls woefully short of satisfying the "transformative" requirement in the fair use analysis.  To satisfy this requirement, "[t]here must be real, substantial condensation of the materials, and intellectual labor and judgment bestowed thereon; and not merely the facile use of the scissors, or extracts of the essential parts, constituting the

---

[1] Displayed immediately beneath the Work's title is a subtitle: "Owner-occupants will get first shot at buying foreclosures." (Compl. Ex. 2.)  As alleged in the Complaint, Mr. Nelson's Infringement solely displays the Work's subtitle, and does not display the Work's original title. (Compl. ¶ 40.) (Compl. Ex. 3.)  Thus, Mr. Nelson cannot reasonably argue that this title replacement constitutes a "transformation" of the Work; the Infringement's use of the Work's subtitle in place of the main title does not add any creative or original expression to the Work or its content. Similarly, upon comparing the Work and the Infringement, it is clear that Mr. Nelson also removed the Work's original attribution of authorship: "By HUBBLE SMITH LAS VEGAS REVIEW-JOURNAL," and inserted his own claim of authorship: "Posted by Michael Nelson under For Buyers, General Information." (Compl. Ex. 2-3.)  This act of plagiarism hardly constitutes transformative value, and, as discussed on page 17, *infra*, is demonstrative of Mr. Nelson's unclean hands.

5

chief value of the original work." *Worldwide Church of God v. Philadelphia Church of God, Inc.,* 227 F.3d 1110, 1117 (9th Cir. 2000).  Moreover, the Court should not be persuaded by Mr. Nelson's futile contention that the Infringement was transformative because "Mr. Nelson aggregated the section of [the Work] into his blog with snippets of other information regarding the state of the Southern Nevada housing market." (Mot. to Dismiss 5: 22-24)  An examination of the numerous blog posts both preceding and following the Infringement demonstrates that Mr. Nelson's purported "montage of information" (Mot. to Dismiss 5: 25) is seemingly nothing more than a disconnected series of copyright infringements. (*See* Compl. Ex. 3-5.)  There is no flow or noticeable transition between the blog posts surrounding the Infringement; this is not an example of a blended molding of stories supplemented with thoughtful or instructive commentary.  Each of these posts appear not to contain any transformative commentary, criticism, or modifications, and are instead merely copied-and-pasted reproductions of other literary works. (*See* Compl. Ex. 3-5.)  The fact that Mr. Nelson simply copies these works (including the subject Work) and displays these unmodified copies on his Website is critical, as "[c]ourts have been reluctant to find fair use when an original work is merely transmitted in a different medium." *Napster, Inc.,* 239 F.3d at 1015 *(citing Infinity Broadcast Corp. v. Kirkwood,* 150 F.3d 104, 108 (2d Cir. 1998)).  As such, in the fair use analysis, no reasonable argument can be made that Mr. Nelson's Infringement was even remotely transformative.

Additionally, the nature of Mr. Nelson's infringing conduct was such that the Infringement effectively supplanted the Work's original purpose.  The courts have repeatedly held that "a work composed primarily of an original, particularly its heart, with little added or changed, is more likely to be a merely superseding use, fulfilling the demand for the original." *Los Angeles Times v. Free Republic,* 54 U.S.P.Q.2d 1453, 1460 (C.D. Cal. Apr. 4, 2000) *(quoting Campbell,* 510 U.S. at 587-88).  At present, Mr. Nelson claims that his blog is intended to provide information regarding the "suitability and desirability of homeownership in Las Vegas," and that the Infringement was posted to help accomplish this purpose. (Mot. to Dismiss 2: 7-9)  However, in asserting this argument, Mr. Nelson conspicuously fails to acknowledge that the Work was likely published for this ***exact same purpose*** – to provide information concerning

the Las Vegas housing market to readers of the Las Vegas *Review-Journal*. (*See* Compl. Ex. 2.)

"[W]here the [defendant's] use is for the same intrinsic purpose as the copyright holder's . . .

***such use seriously weakens a claimed fair use.***" *Worldwide Church of God,* 227 F.3d at 1117

(emphasis added) (*quoting Weissmann v. Freeman,* 868 F.2d 1313, 1324 (2d Cir. 1989)).

Ultimately, Mr. Nelson's act of publicly displaying an unauthorized, verbatim reproduction of a

substantial and significant portion of the Work was an attempt to supersede the Work's original

purpose.

   Furthermore, Mr. Nelson's display of the Infringement unquestionably constituted a

commercial use.  While Mr. Nelson maintains that the Website "was created to be informative,

not as a source of revenue," (Mot. to Dismiss 9: 1-2) the evidence plainly suggests otherwise.  As

evidenced by the Infringement, the Website prominently displays a hyperlink leading users to the

Internet domain found at <michaelnelson.las.mlxchange.com> (the "Real Estate Website").

(Compl. Ex. 3.)  Thus, it can be reasonably assumed that Internet users reading Mr. Nelson's

blog posts on the Website – including users reading the Infringement – were being encouraged or

otherwise directed to visit Mr. Nelson's Real Estate Website.  As evidenced by a printout of the

various sections of Mr. Nelson's Real Estate Website, the Real Estate Website provides

approximately 21,326 real estate listings in the categories of single family residential, high-rise,

multiple dwellings, vacant/subdivided land, and residential rentals. (Coons Decl. ¶ 6.) (Coons

Decl. Ex. 1.)  The Real Estate Website also highlights and advertises the various real estate-

related services offered by Mr. Nelson, stating that Mr. Nelson is a "Realtor who WORKS for

you," and provides Mr. Nelson's phone number, facsimile number, and electronic mail address.

(Coons Decl. ¶¶ 4-5, 7.) (Coons Decl. Ex. 1.)  Finally, the Real Estate Website includes a

"Contact Me" section, wherein prospective clients can provide contact information and submit

information detailing the specific nature of their real estate inquiry. (Coons Decl. ¶ 8.) (Coons

Decl. Ex. 1.)  Accordingly, because readers of Mr. Nelson's Website were being continually

directed to the Real Estate Website, it is difficult for Mr. Nelson to argue that the Website, and

the content posted thereon, was not commercial in nature.

In addition to helping Mr. Nelson achieve a monetary profit, the Website's display of the Infringement may also have helped Mr. Nelson generate good will for his real estate practice. While the evidence clearly indicates that Mr. Nelson received a financial windfall by attracting users to his Website and subsequently directing said users to his Real Estate Website, the Ninth Circuit has nevertheless held that a "[d]irect economic benefit is not required to demonstrate a commercial use." *Napster, Inc.,* 239 F.3d at 1015.  In other words, in the context of fair use, "monetary gain is not the sole criterion . . ." *Worldwide Church of God,* 227 F.3d at 1117. Instead, the threshold for commercial use can be satisfied if the defendant's use of the infringed work generates good will for, and promotes, the defendant's underlying operation. *See Los Angeles Time v. Free Republic,* No. 98-7840, 1999 WL 33644483, at *15-16 (C.D. Cal. Nov. 8, 1999) (finding of fair use is supported by "the fact that defendants' web page is enhanced by use of the articles, and that [sic] fact that the copying assists in generating support, both financial and non-financial, for their operation").  This concept is directly applicable at present.  Mr. Nelson's display of the Infringement, along with his display of other infringing works, was intended not only to attract prospective homebuyers to the Real Estate Website, but also to promote and generate good will for Mr. Nelson's real estate practice.

In sum, Mr. Nelson's unauthorized copying of the Work and display of the Infringement was entirely devoid of transformative value and constituted a commercial use.  Mr. Nelson has failed to refute these fact-based allegations beyond the self-serving, entirely unsubstantiated assertions set forth in the Motion to Dismiss.  Consequently, the first prong in the § 107 analysis weighs heavily against a finding of fair use.

### 2.   *Though Fact-Based in Nature, the Work Entails Originality*

Though the subject Work is largely based on fact, this does not somehow entitle Mr. Nelson to flagrantly infringe on the Work's protected content.  As discussed on page 4, *supra,* the second prong in the fair use analysis requires the court to examine the nature of the copyrighted work. *Worldwide Church of God,* 227 F.3d at 1118.  Generally speaking, fact-based works, such as news reports, are further from the core of intended copyright protection compared

to works based in fiction. *Campbell,* 510 U.S. at 586.  However, the "[c]reation of a nonfiction work, even a compilation of pure fact, entails originality." *Harper & Row Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539, 547 (1985).  Moreover, "a news reporter must determine which facts are significant and recount them in an interesting and appealing manner." *Free Republic,* 54 U.S.P.Q.2d at 1467.  In the instant matter, Hubble Smith, the Work's original author, was forced to compile a series of facts pertaining to Fannie Mae's "First Look" foreclosure assistance program and articulate said facts in an intelligent, organized manner. (*See* Compl. Ex. 2.)  Thus, while the Work is undoubtedly fact-based in nature, the creative, expressive elements associated with the Work's authorship cannot simply be ignored by the Court.  As such, the second prong of the Court's fair use analysis appears to be neutral.

### 3.  *Mr. Nelson Created a Verbatim, Unauthorized Reproduction of the Heart of the Work's Content*

To create the Infringement, Mr. Nelson created a verbatim reproduction of a substantial and significant portion of the Work, and said portion constituted the heart of the Work's content. (*See* Compl. ¶ 17.)  This is significant, as the third prong of the fair use analysis requires the court to consider "the amount and substantiality of the portion used in related to the copyrighted work as a whole." 17 U.S.C. § 107(3).  At present, both the amount of the content copied in relation to the Work as a whole, and the nature and substantiality of such copying, weigh heavily against a finding of fair use.

Integral to this analysis is the well-founded allegation that Mr. Nelson's Infringement represents a verbatim copy of six of the Work's seventeen paragraphs. (*See* Compl. Ex. 2-3.) "[T]he fact that a substantial portion of the infringing work [is] copied verbatim is evidence of the qualitative value of the copied material, both to the originator and to the plagiarist . . ." *Worldwide Church of God,* 227 F.3d at 1118; *see also Campbell,* 510 U.S. at 587 ("whether a substantial portion of the infringing work was copied verbatim from the copyrighted work is a relevant question . . .").  This premise is directly applicable at present.  In fact, the infringing work here – Mr. Nelson's Infringement – far exceeds the "substantial portion" threshold

established by the courts.  Mr. Nelson's Infringement, ***in its entirety***, is copied verbatim from the Work. (*See* Compl. Ex. 2-3.)

Moreover, Mr. Nelson infringed upon the heart of the Work's content.  The Supreme Court has expressly held that the court's consideration of the substantiality of the copy "calls for thought not only about the quantity of the materials used, but about their quality and importance." *Campbell*, 510 U.S. at 587.  In the instant matter, Mr. Nelson's copying of the Work's first six paragraphs arguably represents an infringement of the Work's most significant content.  The Work's first six paragraphs introduce and describe the subject of the Work, Fannie Mae's "First Look" program, and detail the impact this program may have on Nevada residents. (Compl. Ex. 2.)  Upon review of the Work in its entirety, it is difficult to identify another portion of content more integral to the Work as a whole than that set forth in the first six paragraphs. The third factor in the fair use analysis will generally favor the plaintiff so long as the infringed portion constitutes the "heart of the work[]" – regardless of the volume of the defendant's copying. *See, e.g., Los Angeles News Service v. Reuters Television Intern., Ltd.,* 149 F.3d 987, 994 (9th Cir. 1998).  As such, the irreplaceable nature of the infringed-upon portion of the Work in relation to the Work as a whole severely weakens Mr. Nelson's assertion of fair use.

Similarly, Mr. Nelson's extensive copying of the Work far exceeded the amount of copying necessary to further the purported purpose of Mr. Nelson's infringing act.  This allegation is pertinent to the third prong of the fair use analysis: the court must determine whether the extent of the defendant's copying is consistent with the defendant's intended use. *See Campbell,* 510 U.S. at 587-88.  Mr. Nelson states that the Infringement was intended to "introduce the information regarding the program being offered by Fannie-Mae," and that Mr. Nelson did not copy beyond what was needed to accomplish this purpose. (Mot. to Dismiss 8: 7-9)  However, this self-serving statement lacks any form of factual support.  Contrarily, a brief review of the Infringement demonstrates that Mr. Nelson was not required to create a verbatim copy of the Work's first six paragraphs in order to properly "introduce the information." Alternatively, Mr. Nelson could have easily copied-and-pasted the first paragraph, or perhaps the first two paragraphs, of the Work.  In other words, Mr. Nelson could have avoided violating the

Copyright Act altogether by merely paraphrasing and/or summarizing the nature of the Work's content prior to providing a hyperlink back to the Work's original source.  Either of these options would have sufficiently introduced the Work's content, and would have greatly reduced, if not eliminated, the threat of the Infringement superseding the Work's original purpose.  Mr. Nelson neglected such alternative courses of action, instead choosing to far exceed the amount of copying necessary and blatantly infringe on Righthaven's copyright.

Accordingly, Mr. Nelson created an unauthorized, verbatim reproduction of the heart of the Work's content, and such copying went well beyond the extent of copying necessary to achieve Mr. Nelson's alleged purpose.  Mr. Nelson's substantial and significant copying, when viewed in conjunction with the non-transformative nature of Mr. Nelson's Infringement and the commercial motives related thereto, effectively precludes any reasonable assertion of fair use.

### 4.  *Mr. Nelson's Infringement Materially Impaired the Value of, and Potential Market for, the Work*

As the owner of the copyright in and to the Work, Righthaven is entitled to a presumption of market harm in light of the commercial nature of Mr. Nelson's Infringement. *See Sony Corporation. of America v. Universal City Studios, Inc.,* 464 U.S. 417, 451 (1984). Notwithstanding this presumption, both the value of the Work and the potential market for the Work have been adversely impacted by Mr. Nelson's Infringement.  As a result, the fourth and final factor in the fair use analysis must be viewed in Righthaven's favor.

The facts and circumstances surrounding Mr. Nelson's Infringement are such that material impairment of the Work's market is presumed.  In *Sony Corporation*, the Supreme Court explained that "[i]f the intended use is for commercial gain, that likelihood [of market harm] may be presumed." *Sony Corp.,* 464 U.S. at 541.  As detailed on pages 7-8, *supra*, there is little dispute that Mr. Nelson's intended use of the Infringement was directed toward achieving a commercial gain. (*See* Coons Decl. Ex. 1.)  Thus, should this Court agree with Righthaven's argument regarding the commercial nature of the Infringement, this analysis need go no further.

11

Even assuming, *arguendo*, that Righthaven is not entitled to a presumption of market harm, both the present facts and the applicable case law definitively substantiate Righthaven's position. First, as opposed to a transformative work, "a work that merely supplants or supersedes another is likely to cause a substantially adverse impact on the potential market of the original." *Sony Computer Entertainment, Inc. v. Connectix Corporation,* 203 F.3d 596, 607 (9th Cir. 2000). As established herein, Mr. Nelson's Infringement supersedes the Work's original purpose because the Infringement: (l) is entirely devoid of transformative value, and (2) represents a verbatim copy of the heart of the Work's content. As such, the nature of Mr. Nelson's Infringement significantly increases the likelihood of market harm. Additionally, in the unlikely event that the Court does not classify Mr. Nelson's Infringement as a commercial use, the Court's analysis of present or future market harm must also consider "whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market for the original." *Campbell,* 510 U.S. at 590 (internal quotation marks omitted). In this regard, the appropriate inquiry "must take account not only of harm to the original but also of harm to the market for derivative works." *Id. (quoting Harper & Row,* 471 U.S. at 568).[2] Such reasoning, when applied to the instant case, clearly reflects the presence of potential market harm. If numerous, additional individuals were to replicate Mr. Nelson's infringing act, the market for both the Work and derivatives of the Work would be inevitably diminished, regardless of the intentions of each individual infringer. Furthermore, the Ninth Circuit has held that the § 107(4) analysis is not limited to market impairment; this analysis also includes "the effect of the use on the *value* of the copyrighted work." *Worldwide Church of God,* 227 F.3d at 1119 *(quoting* 17 U.S.C. § 107(4)) (emphasis in original). Thus, "even copying for noncommercial purposes may impair the copyright holder's ability to obtain the rewards that Congress intended him to have . . . [t]hose rewards need not be limited to monetary rewards; compensation may take a variety of forms." *Id. (quoting Sony Corp.,* 464 U.S. at 450). In other words, while Righthaven is entitled to a presumption of market harm because Mr. Nelson's unauthorized use of the Work was motivated by commercial gain, the Court's

---

[2] Similarly, in this analysis, "[a]ctual present harm need not be shown; such a requirement would leave the copyright holder with no defense against predictable damage." *Sony Corp.,* 464 U.S. at 451.

1    inquiry into the final fair use factor is not dependent upon this allegation.  This analysis is

2    sufficiently resolved by the simple fact that widespread infringement of the Work – similar to

3    that committed by Mr. Nelson – would result in the substantial impairment of the Work's present

4    and future value.

5            Beyond the instant action, the market for literary works – particularly literary works

6    emanating from newspapers – must be protected in light of the aggregate effect of Internet-based

7    copyright infringements.  It is no secret that newspapers across the country are in distress as

8    readership numbers have drastically declined.  In 2009, the *Washington Post* reported that

9    newspaper circulation in the United States is at its lowest level in 70 years.[3]  In fact, there is a

10   website entitled "newspaperdeathwatch.com" – a site dedicated to "chronicling the decline of

11   newspapers."[4]  The decline of newspapers nationwide has coincided with the rise of the Internet,

12   and thus coincided with the rise of Internet-based copyright infringements such as those

13   committed by Mr. Nelson.  Furthermore, the mere fact that an online infringement of a

14   newspaper's work is not always attributable to competing news outlets is of minimal relevance; a

15   recent study by the Pew Internet and American Life Project found that "[t]hree-quarters of

16   people who consume news online said they do so thanks to e-mails or posts on social media

17   sites."[5]  Thus, whether the Internet-based copyright infringement of an article published by the

18   Las Vegas *Review-Journal* is committed by the *Las Vegas Sun*, by the *New York Times*, or by

19   Mr. Nelson's Website, the public display of that infringement still has the detrimental effect of

20   diverting valuable Internet traffic away from the original source publication.  Accordingly,

21   Righthaven has implemented a systematic, well-founded approach directed towards stemming

22   the tide of Internet-based infringements and protecting the potential market for, and value of,

23   copyrighted literary works.  And as these copyrights represent a significant portion of media

24   company assets, newspapers across the country are prudently beginning to adopt the Righthaven

25

26   [3] http://www.washingtonpost.com/wp-dyn/content/article/2009/10/26/AR2009102603272.html

27   [4] http://newspaperdeathwatch.com/

28   [5] http://arstechnica.com/gadgets/news/2010/02/internet-overtakes-print-in-news-consumption-among-americans.ars

approach.[6]   However, all efforts to protect the ownership rights of newspapers (and other media companies) will be diminished if defendants such as Mr. Nelson are able to avoid liability on the basis of fair use, despite said defendants' obvious contributions to the aggregated market harm for these copyrighted works.

The potential reduction of a literary work's present and future market value resulting from Internet-based copyright infringement is exemplified by the court's holding in *Free Republic.*  In *Free Republic*, the defendants asserted a fair use defense to justify the posting of the plaintiff's newspaper articles on the defendants' website. *Free Republic,* 54 U.S.P.Q.2d at 1455-59.  In finding against fair use, the District Court for the Central District of California explained: "Defendants use 'substitutes' for the originals, and has the potential of lessening the frequency with which individuals visit plaintiffs' websites, of diminishing the market for the sale of archived articles, and decreasing the interest in licensing the articles." *Id.* at 1471.  Similar reasoning should be applied here.  As Mr. Nelson's Infringement arguably substitutes for the original Work, it is reasonable to believe that readers may be diverted from the Work's original source publication.  Moreover, the availability of the Infringement on Mr. Nelson's Website could potentially diminish the sales value of the archived Work and also cause potential licensees to refrain from seeking a license in the Work.[7]   Such effects are certainly foreseeable and do not support a finding of fair use.

Finally, the Court should not be persuaded by Mr. Nelson's bald-faced assertion that the Website "would likely benefit, not harm the Review Journal's market." (Mot. to Dismiss 9: 5-6) This speculative and conclusory argument – thinly disguised as an expert opinion – is entirely

---

[6] *See* http://www.wired.com/threatlevel/2010/07/copyright-trolling-for-dollars/

[7] Furthermore, despite Mr. Nelson's erroneous speculation to the contrary, the terms of the Righthaven Assignment are such that Righthaven's copyright ownership is not limited solely to the right to pursue legal recourse for copyright infringements of the Work. (*See* Ex. 1.)  As evidenced by Exhibit 1, attached hereto, the all-inclusive terms of the Righthaven Assignment effectively negate Mr. Nelson's hypothesized argument set forth on page 9 of the Motion to Dismiss. (Mot. to Dismiss 9: 10-14)  Additionally, while Righthaven's exclusive copyright ownership entitles Righthaven to commercially benefit from the use of the Work, this fact has no bearing on the fair use analysis.  17 U.S.C. § 107(4) solely examines "the effect of the use upon the potential market for or value of the copyrighted work."  Said provision does ***not*** specifically consider the effect of the use upon the potential market for ***the plaintiff's*** use of the copyrighted work. *See* 17 U.S.C. § 107(4).

14

irrelevant to the fair use analysis.  Courts across the country have repeatedly rejected the proposition that the use of a copyrighted work is fair because said use might somehow increase the demand for the plaintiff's work. *See, e.g., Campbell,* 510 U.S. at 591 n. 21 (even if a "film producer's appropriation of a composer's previously unknown song . . . turns the song into a commercial success[,] the boon to the song does not make the film's simple copying fair"); *DC Comics Inc. v. Reel Fantasy, Inc.,* 696 F.2d 24, 28 (2d Cir. 1985) ("Since one of the benefits of ownership of copyrighted  material is the right to license its use for a fee, even a speculated increase in DC's comic book sales as a consequence of RFI's infringement would not call the fair use defense into play as a matter of law. The owner of the copyright is in the best position to balance the prospect of increased sales against revenue from a license"); *Ringgold v. Black Entertainment Television, Inc.,* 126 F.3d 70, 81 n. 16 (2d Cir. 1997) ("Even if the unauthorized use of plaintiff's work in the televised program might increase poster sales, that would not preclude her entitlement to a licensing fee").  Mr. Nelson's wishful contention also fails to account for the possibility that readers may be diverted from the Work's original source publication as a result of the Infringement's availability on the Website.  Ultimately, this wholly speculative argument has no bearing on the Court's analysis and does nothing to bolster Mr. Nelson's assertion of fair use.

**B.** ***The Reckless Assertion of Unclean Hands as a Defense to Mr. Nelson's Blatant Copyright Infringement Should Not be Entertained by the Court***

Righthaven's assertion of the instant copyright infringement claim is well-founded both in fact and in law, and is entirely devoid of illegality or transgression on behalf of Righthaven. Consequently, Mr. Nelson's assertion of the defense of unclean hands is both reckless and entirely unmeritorious.  The "defense of illegality or unclean hands is 'recognized only rarely, when the plaintiff's transgression is of serious proportions and relates directly to the subject matter of the infringement action.'" *Dream Games of Arizona, Inc. v. PC Onsite,* 561 F.3d 983, 990-91 (9th Cir. 2009) *(quoting* 4 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 13.09[B] (2008)).  For example, the defense of unclean hands has been recognized

in situations where a plaintiff "misused the process of the courts by falsifying a court order or evidence, or by misrepresenting the scope of his copyright to the court and opposing party." *Id.* The courts have also used this defense to prevent "the copyright owner from asserting infringement and asking for damages when the infringement occurred by his dereliction of duty." *Supermarket of Homes, Inc. v. San Fernando Valley Bd. of Realtors,* 786 F.2d 1400, 1408 (9th Cir. 1986) (*citing Tempo Music, Inc. v. Meyers,* 407 F.2d 503, 507 (4th Cir. 1969)).  None of these factors are even remotely present in this case.  Righthaven has not falsified any evidence, not misrepresented the scope of the Righthaven Assignment, and the claim for relief does not arise out of Righthaven's own neglect.  Furthermore, Mr. Nelson has not made any allegations to these effects.

Contrarily, Mr. Nelson bases his unclean hands defense on a variety of unrelated facts, none of which have any bearing on the legal standard for unclean hands, or any bearing on this lawsuit in general.  For instance, Mr. Nelson points out that Righthaven is not the author of the Work, (Mot. to Dismiss 9:23) and that Righthaven acquired the copyright in the Work subsequent to the date of the Infringement. (Mot. to Dismiss 10: 1-2)  However, both of these facts are immaterial: regardless of the effective date of the Righthaven Assignment, said assignment vested Righthaven with the right to seek redress for all past, present, and future infringements of the Work. (Ex. 1.)  Additionally, assignments of this nature of expressly permitted by both the Copyright Act and the courts. 17 U.S.C. § 201(d)(1); *see, e.g., ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 944 F.2d 971, 980 (2d Cir. 1991).  Mr. Nelson also supports his unclean hands defense by stating that Righthaven did not send a cease-and-desist letter prior to filing suit. (Mot. to Dismiss 10: 5-7)  However, Mr. Nelson fails to cite any legal authority to support this notion that Righthaven was required to take this course of action.  Irrelevant, entirely unsubstantiated assertions such as those set forth by Mr. Nelson are wholly insufficient for the purposes of establishing a legitimate unclean hands defense.  Contrarily, an action will only be dismissed on the basis of unclean hands if the defendant is able to prove that the "plaintiff's evidence was false ***and*** that plaintiff was involved in a scheme to defraud the

public." *Supermarket of Homes, Inc.,* 786 F.2d at 1408 (emphasis added).  Mr. Nelson does not

come anywhere close to proving either of these requirements, nor does any such proof exist.

   Ironically, the only conduct seemingly rising to the level of unclean hands in this matter

has been that of Mr. Nelson.  As clearly demonstrated by the evidence, Mr. Nelson not only

created a verbatim, unauthorized reproduction of the heart of the Work's content, but Mr. Nelson

also removed the original attribution of authorship in order to insert himself as the credited

author. (Compl. Ex. 2-3.)  While the Work plainly states: "By HUBBLE SMITH LAS VEGAS

REVIEW-JOURNAL," such credit is nowhere to be found in Mr. Nelson's Infringement.

(Compl. Ex. 2-3.)  Instead, on the Infringement, Mr. Nelson erroneously attributes authorship to

himself: "Posted by Michael Nelson under For Buyers, General Information." (Compl. Ex. 3.)

Such deceptive conduct is neither transformative, nor creative, nor expressive.  Simply stated,

this act – essentially one of plagiarism – most accurately exemplifies the presence of unclean

hands in this lawsuit.

   Ultimately, Mr. Nelson's assertion of an unclean hands defense is nothing more than a

diversionary tactic employed by a blatant copyright infringer.  Mr. Nelson has not challenged

Righthaven's standing as the rightful litigant in this lawsuit, nor has Mr. Nelson challenged the

validity of Righthaven's evidence.  This lawsuit arises not from any transgression committed by

Righthaven, but from Mr. Nelson's utter disregard for the Work's copyright ownership.  As such,

Mr. Nelson's reckless assertion of unclean hands cannot be entertained by the Court.


   **C.** ***Mr. Nelson Seeks Dismissal of Claims that Do Not Exist***

   Mr. Nelson has failed to accurately review Righthaven's Complaint.  In the Motion to

Dismiss, Mr. Nelson seeks the dismissal of all claims for relief arising from Mr. Nelson's

infringement of the Property Values Article and the Homeownership Article. (Mot. to Dismiss 3:

2-17) (*See* Compl. Ex. 4-5.)  However, as plainly set forth in the Complaint, Righthaven's lone

claim for relief derives from Mr. Nelson's unauthorized reproduction of the Work. (Compl. ¶¶

43-56.)  Neither the Property Values Article nor the Homeownership Article is mentioned in

Righthaven's claim for relief.  Instead, Mr. Nelson's infringements of these two articles are

merely cited in support of the Complaint's jurisdictional allegations. (Compl. ¶¶ 24-29.) Accordingly, Righthaven's claims arising from Mr. Nelson's infringement of the Property Values Article and the Homeownership Article need not be dismissed, as such claims simply do not exist.

**IV.**     **CONCLUSION**

For the reasons set forth above, Righthaven respectfully requests that this Court deny Mr. Nelson's Motion to Dismiss in its entirety.

Dated this sixteenth day of August, 2010.

RIGHTHAVEN LLC

By: /s/ J. Charles Coons

STEVEN A. GIBSON, ESQ.
Nevada Bar No. 6656
J. CHARLES COONS, ESQ.
Nevada Bar No. 10553
9960 West Cheyenne Avenue, Suite 210
Las Vegas, Nevada 89129-7701
Attorneys for Plaintiff

18

## CERTIFICATE OF SERVICE

Pursuant to Federal Rule of Civil Procedure 5(b), I hereby certify that I am an employee of Righthaven LLC and that on this sixteenth day of August, 2010, I caused the **PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS** to be served by the Court's CM/ECF system.

By: /s/ J. Charles Coons

J. CHARLES COONS, ESQ.
Righthaven LLC
9960 West Cheyenne Avenue, Suite 210
Las Vegas, Nevada 89129-7701